**ELLIOTT ASSOCIATES, L.P.,**
**Plaintiff-Appellant,**

v.

**BANCO DE LA NACION and the Republic of Peru, Defendants-Appellees.**

Docket Nos. 98–9268, 98–9319

United States Court of Appeals,
Second Circuit.

Argued: May 5, 1999.

Decided: Oct. 20, 1999.

Otto G. Obermaier, New York City (Brian S. Rosen, Eli Gottesdiener, Steven Shebar, Ross Morrison, Richard A. Simon, Daniel C. Richman, Weil, Gotshal & Manges, New York City), for Plaintiff–Appellant.

Mark A. Cymrot, Washington, D.C. (Peder A. Garske, Mark I. Bailen, Barbra M. Kolton, Baker & Hostetler, Washington, D.C.), for Defendants–Appellees.

Thomas Moers Mayer and Philip Bentley, Kramer Levin Naftalis & Frankel LLP, New York City, for Amici Curiae Angelo, Gordon & Co., L.P., The Baupost Group LLC, Contrarian Capital Management, LLC, Franklin Mutual Advisers, Inc. and Van Eck Associates Corporation.

Nancy Jacklin, Clifford Chance, New York City, and Paul Saltzman and Sarah M. Starkweather, The Bond Market Association, New York City (Jayne S. Robinson and K. Ann McDonald, Robinson, Murphy & McDonald, New York City, of counsel), for Amicus Curiae The Bond Market Association.

Jeffrey T. Kraus and Jeffrey P. Dejong, Altheimer & Gray, Chicago, Illinois, for Amicus Curiae The Commercial Law League of America.

Danforth Newcomb and Richard A. Lingg, Shearman & Sterling, New York City (Michael M. Chamberlin, Aviva Werner, Emerging Markets Traders Association, New York City, of counsel), for Amicus Curiae Emerging Markets Traders Association.

Steven J. Blauner, Milbank, Tweed, Hadley & McCloy, New York City, for Amicus Curiae Loan Syndications & Trading Association, Inc.

Before: McLAUGHLIN, LEVAL, and MICHEL*, Circuit Judges.

MICHEL, Circuit Judge:

Plaintiff–Appellant Elliott Associates, L.P. ("Elliott") appeals from the amended final judgments entered by the United States District Court for the Southern District of New York on September 3 and 15, 1998. The district court, after a bench trial, dismissed with prejudice Elliott's complaints seeking damages for the nonpayment of certain debt by Defendants–Appellees The Republic of Peru ("Peru") and Banco de la Nacion ("Nacion") (together, the "Debtors") because it found that Elliott had purchased the debt in violation of Section 489 of the New York Judiciary Law ("Section 489"). *See Elliott Assocs. v. Republic of Peru*, 12 F.Supp.2d 328 (S.D.N.Y.1998). Because, contrary to the district court's interpretation, the pertinent case law demonstrates that Section 489 does not preclude relief in lawsuits, such as Elliott's, seeking primarily to collect on lawful debts and only filed absent satisfaction, we reverse the judgments of the district court.

## BACKGROUND

Elliott is an investment fund with its principal offices located in New York City. Elliott was founded by Paul Singer in 1977 and he remains its sole general partner. One of the primary types of instruments that Elliott invests in is the securities of "distressed" debtors, that is, debtors that have defaulted on their payments to creditors. Singer testified that he invests in debt when he believes that the true or "fundamental" value of the debt is greater than the value accorded by the market. Elliott characterizes its approach to its investments as "activist." Thus, despite sometimes accepting the terms offered to other creditors, Elliott explains that it frequently engages in direct negotiations with the debtor and argues that, as a result, it has occasionally received a greater return than other creditors.

In August or September of 1995, Singer was approached by Jay Newman to discuss investing in distressed foreign sovereign debt. Newman, an independent consultant, had worked in the emerging market debt field at major brokerage houses Lehman Brothers, Dillon Read, and Morgan Stanley, as well as managing his own offshore fund, the Percheron Fund. The secondary market for such debt first developed in the early 1980s when the original lender banks began selling the non-performing debt of countries that had ceased servicing their external debt to other investors, including brokerage firms, in order to reduce the banks' exposure and to permit them to lend additional funds to developing countries. The Debtors submitted evidence at trial that, from 1993

---

* The Honorable Paul R. Michel, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

onwards, Newman had acted with attorney Michael Straus to solicit investors and provide advice to offshore fund Water Street Bank & Trust Company, Ltd.. ("Water Street"). The Debtors alleged that, at Water Street, Newman and Straus purchased the sovereign debt of Poland, Ecuador, Ivory Coast, Panama, and Congo, and filed lawsuits seeking full payment of the debt with Straus acting as the trial counsel. The Debtors' contention at trial in the instant case was that Newman and Straus moved to Elliott from Water Street because it was a good "substitute plaintiff" in that it specialized in the purchase of distressed assets, had funds available to invest, and, unlike Water Street, which had refused in discovery to disclose the names of its individual investors, was unconcerned about exposing the identity of its principals.

I.

At Newman's recommendation, in October 1995, Elliott purchased approximately $28.75 million (principal amount) of Panamanian sovereign debt for approximately $17.5 million. In July 1996, Elliott brought suit against Panama seeking full payment of the debt. Elliott obtained a judgment and attachment order and, with interest included, ultimately received over $57 million in payment.

At the time of Elliott's purchase of Panamanian debt, Panama was finalizing its Brady Plan debt restructuring program. The term "Brady Plan" derives from a March 1989 speech by Nicholas Brady, then Secretary of the United States Treasury, urging commercial lenders to forgive some of the debt that they were owed by less developed countries, restructure what remained, and continue to grant those countries additional loans. *See generally,* Ross P. Buckley, *The Facilitation of the Brady Plan: Emerging Markets Debt Trading From 1989 to 1993,* 21 Fordham Int'l L.J. 1802 (1998). Brady Plans contemplate that, in return for such voluntary partial debt forgiveness, the less developed country will submit to an economic austerity program supervised and monitored by the International Monetary Fund (the "IMF"). The purpose of implementing Brady Plans is to avoid the recurrence of debt defaults by less developed countries that have occurred from 1982 onwards. Typically, the terms of a Brady Plan are negotiated with the debtor country by an *ad hoc* committee of the nation's largest institutional creditors, generally known as the "Bank Advisory Committee." The members of the Bank Advisory Committee commit to restructuring the debt that they hold on the agreed terms and those terms are also offered to other creditors. However, while the members of the Bank Advisory Committee usually agree to be bound by the negotiated terms, the other creditors are under no such obligation to accept those terms.

In January 1996, Newman recommended that Elliott purchase Peruvian sovereign debt. Newman testified at trial that he believed that Peruvian sovereign debt was a good investment because of the sweeping economic reforms implemented by President Alberto Fujimori following his election in November 1990 in the wake of a severe six-year recession. Newman testified that he viewed Peru's Brady Plan, announced in October 1995, as undervaluing Peru's outstanding debt. In particular, Newman contended that the large commercial bank creditors that made up the Bank Advisory Committee had institutional incentives to accept reduced terms for the debt they held, such as the desire to make additional loans and to operate domestically within the country, and that he believed that the Bank Advisory Committee had not been privy to all material financial information, including Peru's rumored repurchase of a significant proportion of its debt.

Between January and March 1996, Elliott purchased from international banks ING Bank, N.V. ("ING") and Swiss Bank Corporation ("Swiss Bank") approximately $20.7 million (in principal amount) of the

working capital debt of Nacion and Banco Popular del Peru ("Popular"), a bankrupt Peruvian bank. The debt was sold under a series of twenty-three letter agreements (the "Letter Agreements"). Elliott paid approximately $11.4 million for these debt obligations and all of the debt was guaranteed by Peru pursuant to a written guaranty dated May 31, 1983 (the "Guaranty"). Under their express terms, both the Letter Agreements and the Guaranty were governed by New York law. In connection with this transaction, Elliott executed two separate assignment agreements with ING and Swiss Bank, dated March 29, 1996, and April 19, 1996, respectively.

The Peruvian sovereign debt purchased by Elliott was working capital debt, rather than syndicated bank debt. Working capital debt does not involve an agent bank, but instead consists of direct loans between single lenders and borrowers, whereas syndicated bank debt is debt syndicated by a lead bank, which maintains books and records for all holders. Because the buyer has to rely upon the seller, rather than an agent bank, to convey good title, working capital debt typically trades at a discount of several percentage points from syndicated debt. The Debtors argued at trial that Elliott chose to purchase working capital debt because it sold at a greater discount to value than syndicated debt and thus would have more value in a lawsuit seeking full payment of the debt, despite being more difficult to trade on the secondary market due to its illiquidity.

The district court found that the timing of Elliott's purchases of Peruvian debt and the closing of the assignment agreements paralleled key events in *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru,* 9 F.Supp.2d 300 (S.D.N.Y. 1998). *See Elliott Assocs.,* 12 F.Supp.2d at 336. Pravin Banker, an investment fund, had filed suit on two 1983 letter agreements of Popular, which at that time was being liquidated under Peru's IMF austerity plan. After eighteen months of stays, on August 24, 1995, the district court entered summary

judgment for Pravin Banker and, on January 19, 1996, the district court issued its damages ruling. The Debtors argued at trial in the instant case that Elliott did not begin purchasing Peruvian debt until the *Pravin Banker* decision in order that there would be no defense to a quick judgment. In support of this, the Debtors elicited testimony from Singer and Newman that they had followed and discussed the *Pravin Banker* case, although Newman claimed that Elliott's decision to purchase Peruvian debt shortly after the damages ruling was "just a coincidence." The Debtors further argued that Elliott avoided closing on the trades until after April 12, 1996, on which date a full stay pending appeal was denied by this court in the *Pravin Banker* case. *Pravin Banker Assocs Ltd. v. Banco Popular Del Peru,* 109 F.3d 850 (2d Cir.1996). The Debtors supported this allegation by contending that Elliott refused to close using standard Emerging Markets Traders Association forms, but instead delayed by requesting provisions in the agreements that were not customary in the trade.

On May 1, 1996, Elliott delivered joint notices of the assignments to the Debtors' reconciliation agent, Morgan Guaranty, to register the debt it had purchased in order that it could obtain its *pro rata* share of the interest payments the Debtors had promised to make to all creditors. The following day, Elliott notified Nacion, Popular, and Peru by letter that it was now one of their creditors and that it wished to initiate discussions regarding repayment. Although a telephone conference call between counsel followed, no negotiations on repayment terms occurred. Rather, the Debtors took the position that Elliott was not a proper assignee because it was not a "financial institution" within the scope of the assignment provision of the Letter Agreements and that Elliott should either transfer the debt to an eligible "financial institution" or else participate in the Brady

Plan with the other creditors.[1]

On June 25, 1996, after a continued impasse in the parties' discussions, Elliott formally requested repayment by sending the Debtors a notice of default. The Debtors pointed out at trial that this notice was sent during the voting period on the Term Sheet of Peru's Brady Plan. The Debtors also noted that, although the Brady Plan negotiations took place from January to June 1996, Elliott did not contact the Bank Advisory Committee to express its views. Ultimately, Peru's Brady Plan was agreed upon by 180 commercial lenders and suppliers, and entailed, *inter alia,* an Exchange Agreement under which old Peruvian commercial debt, including the 1983 Letter Agreements, would be exchanged for Brady bonds and cash.

## II.

On October 18, 1996, ten days before the Exchange Agreement was scheduled to be executed, Elliott filed suit against the Debtors in New York Supreme Court and sought an *ex parte* order of prejudgment attachment. The Debtors subsequently alleged at trial that the reason for Elliott filing suit at that time was that the collateral for the Brady bonds was United States Treasury bonds, which were held at the Federal Reserve Bank of New York, and thus made suitable assets for attachment. The Exchange Agreement was finally executed on November 8, 1996.

Elliott's suit was subsequently removed to federal district court pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1441(d) (1994), where the district court denied Elliott's motion for prejudgment attachment on December 27, 1996, and its motion for summary judgment on April 29, 1997. After discovery, the case was tried in a bench trial from March 17 to

March 25, 1998, and final argument was heard on May 26, 1998.

On August 6, 1998, the district court issued its opinion dismissing Elliott's complaint on the ground that Elliott's purchase of the Peruvian debt violated Section 489 of the New York Judiciary Law. The district court found as a fact that "Elliott purchased the Peruvian debt with the intent and purpose to sue." *Elliott Assocs.,* 12 F.Supp.2d at 332 (S.D.N.Y.1998). The district court noted that Elliott had no familiarity with purchasing sovereign debt until it met Newman, who together with Straus, had "a long history" in purchasing sovereign debt and suing on it. *Id.* at 333–35. The district court further found that Elliott intentionally "delayed closing its purchases of Peruvian debt until the Second Circuit had clarified the litigation risks." *Id.* at 336. Moreover, the district court found that "Elliott did not seriously consider alternatives to bringing an action," including holding and reselling the debt, participating in Peru's privatization program, participating in the Brady Plan, or negotiating separately with the Debtors to obtain terms more favorable than the Brady terms. *Id.* at 338. The district court found that "none of these alternatives was realistically considered by Elliott when it purchased Peruvian debt" and that "[f]rom the start, Elliott intended to sue and the testimony to the contrary was not credible." *Id.* With respect to the letters sent by Elliott to the Debtors after purchasing the debt, the court found that these letters and the other accompanying steps to negotiate "were pretextual and never demonstrated a good faith negotiating position." *Id.* at 342.

After making its "Findings of Fact," the court set forth its "Conclusions of Law." Applying basic contract law principles, the court first concluded · that Nacion had breached the Letter Agreements by failing

---

**1.** The Debtors' arguments regarding the interpretation of the "financial institutions" clause in the assignment provision of the Letter Agreements had previously been rejected by the district court in *Pravin Banker,* which

ruling was subsequently affirmed by this court. *See Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850, 856 (2d Cir.1997).

to pay Elliott the amounts due and owing and that Peru had breached the Guaranty by not paying Elliott the amounts due and owing under the Letter Agreements following Nacion's default. *See id.* at 344.

The court then turned to the Debtors' defense that Elliott's claim should be dismissed because the assignments were in violation of Section 489 of the New York Judicial Law, which prohibits the purchase of a claim "with the intent and for the purpose of bringing an action or proceeding thereon." The court explained that while "Elliott's position is strong as a matter of policy in the world of commerce ... the Court's role here is not to make policy assessments—to rank its preferences among contract, property, and champerty doctrines." *Id.* at 345. The court noted the case law holding that the intent to sue must be primary, not merely contingent or incidental. *See id.* at 345–46. Examining the legislative history, the court explained that, while Section 489 was originally aimed at attorneys, subsequent revisions indicated an intent to cover "corporations" and "associations." *See id.* at 349–50. Moreover, the court observed that "[Section] 489's roots in the Medieval law of champerty and maintenance provides support for the conclusion that, while not all assignments with the intent to bring suit thereon are barred, assignments taken for the purpose, or motive, of stirring up litigation and profiting thereby are prohibited." *Id.* at 351.

The district court then rejected Elliott's arguments that the statute was only aimed at: (1) suits which have the purpose of obtaining costs; or (2) suits where corporations engage in the unauthorized practice of law by taking claims with the intent to sue on them *pro se* without hiring counsel. *See id.* at 351–54. The court also rejected Elliott's argument that the statute does not apply when all right, title, and interest are conveyed by the assignor. *See id.* at 354. Finally, the court rejected as without merit Elliott's arguments that: (1) Elliott, as a limited partnership, is not

an "association" within the meaning of the statute; (2) the Debtors' interpretation of the statute would render it in violation of the Commerce Clause; and (3) the Debtors lacked standing to raise the Section 489 defense because they were not parties to the assignment agreement. *See id.* at 356 n. 20. Consequently, because Elliott purchased the debt with the intention to bring suit thereon, the court concluded that Elliott's contracts violated Section 489 and were unenforceable. *See id.* at 356.

Turning to other arguments and defenses, although Section 3 of Peru's Guaranty provided that Peru shall pay all guaranteed amounts "regardless of any law, regulation or order now or hereafter in effect in any jurisdiction," the court rejected Elliott's argument that this waived Peru's Section 489 defense, reasoning that Section 489 is a penal law directed at the public interest that cannot be waived. *See id.* at 356–58. Finally, although not necessary to its disposition, the court rejected Nacion's argument that it was excused from performance due to impossibility as a result of a Peruvian government decree purportedly removing Nacion as a debtor under the Letter Agreements. *See id.* at 358–60.

The district court entered its judgment dismissing Elliott's complaint on August 26, 1998. Amended judgments were then issued on September 3 and 15, 1998. Elliott timely filed its notices of appeal on September 18 and 24, 1998. After briefing from the parties, as well as the filing of five *amicus curiae* briefs, this appeal was submitted for our decision following oral argument on May 5, 1999. We have jurisdiction to decide this appeal under 28 U.S.C. § 1291 (1994).

## DISCUSSION

### I.

#### A.

■ As an initial matter, while in agreement that the district court's findings of fact are reviewed for clear error, *see* Fed.

R.Civ.P. 52(a), the parties dispute the appropriate level of deference to be given to the district court's interpretation of Section 489 of the New York Judiciary Law. The Debtors urge that we follow this court's statement in *Ewing v. Ruml,* 892 F.2d 168 (2d Cir.1989), that "[where] the interpretation of state law is made by a district judge sitting in that state, it is entitled to great weight and should not be reversed unless it is clearly wrong." *Id.* at 171. Both *Ewing* and the other case relied upon by the Debtors for this proposition, *Lomartira v. American Auto. Ins. Co.,* 371 F.2d 550 (2d Cir.1967), were decided before the Supreme Court's decision in *Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), which resolved a split among the Circuits on this very issue. In *Salve Regina College,* the Supreme Court expressly held that "a court of appeals should review de novo a district court's determination of state law." *Id.* at 231. Subsequent appeals decided by this Circuit have thus accorded no deference to district court interpretations of state law, nor will we. *See, e.g., Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 132 (2d Cir.1999) (reviewing *de novo* New York district court's determination of New York law of strict product liability for design defects); *McCarthy v. Olin Corp.,* 119 F.3d 148, 153 (2d Cir.1997) ("We determine *de novo* what the law of New York is."); *Sutera v. Go Jokir, Inc.,* 86 F.3d 298, 301 (2d Cir. 1996) (stating that "no deference to the district court's determination of New York law" was due); *In re Males,* 999 F.2d 607, 609 (2d Cir.1993) ("[I]n our de novo review we are not required to give deference to the district court's interpretation of the state law.").

◼ In determining the law of the State of New York, "we will consider not only state statutes but also state decisional law." *Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 650 (2d Cir.1994). "In making this determination, we afford the greatest weight to decisions of the New York Court of Appeals." *McCarthy,* 119 F.3d at 153. "Where the law of the state is uncertain or ambiguous, we will carefully predict how the highest court of the state would resolve the uncertainty or ambiguity." *Bank of N.Y.,* 35 F.3d at 650. "Where the high court has not spoken, the best indicators of how it would decide are often the decisions of lower state courts." *In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 850 (2d Cir.1992). Indeed, "a federal court is free to consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues." *Leon's Bakery, Inc. v. Grinnell Corp.,* 990 F.2d 44, 48 (2d Cir.1993).

### B.

◼ Besides arguing for reversal, Elliott has moved for the alternative relief of certifying the issue of the interpretation of Section 489 to the New York Court of Appeals pursuant to Second Circuit Rule § 0.27. *See also* New York Court of Appeals Rule 500.17 (permitting that court to accept and decide such certified questions). This court has explained that "issues of state law are not to be routinely certified to the highest court[] of New York ... simply because a certification procedure is available. The procedure must not be a device for shifting the burdens of this Court to those whose burdens are at least as great." *Kidney v. Kolmar Labs., Inc.,* 808 F.2d 955, 957 (2d Cir.1987). "Because it is our job to predict how the forum state's highest court would decide the issues before us, we will not certify questions of law where sufficient precedents exist for us to make this determination." *McCarthy,* 119 F.3d at 154. In the instant appeal, as discussed *post,* we conclude that there is sufficient case law for us to determine that Elliott's conduct, as found to have occurred by the district court, was not proscribed by Section 489 of the New York Judiciary Law. Accordingly, we deny Elliott's alternative motion for certification as moot in light of our disposition.

## II.

### A.

The pivotal issue upon which this appeal necessarily turns is whether, within the meaning of Section 489 of the New York Judiciary Law, Elliott's purchase of Peruvian sovereign debt was "with the intent and for the purpose of bringing an action or proceeding thereon," thereby rendering the purchase a violation of law. Because the proper interpretation of Section 489 is at the heart of our decision, we quote it in its entirety below:

### § 489. Purchase of claims by corporations or collection agencies

No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, *with the intent and for the purpose of bringing an action or proceeding thereon;* provided however, that bills receivable, notes receivable, bills of exchange, judgments or other things in action may be solicited, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in charge of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise. Nothing herein contained shall affect any assignment heretofore or hereafter taken by any moneyed corporation authorized to do business in the state of New York or its nominee pursuant to a subrogation agreement or a salvage operation, or by any corporation organized for religious, benevolent or charitable purposes.

Any corporation or association violating the provisions of this section shall be liable to a fine of not more than five thousand dollars; any person or co-partnership, violating the provisions of this section, and any officer, trustee, director, agent or employee of any person, co-partnership, corporation or association violating this section who, directly or indirectly, engages or assists in such violation, is guilty of a misdemeanor.

N.Y. Jud. § 489 (McKinney 1983) (emphasis added).

In interpreting Section 489, we are guided by the principle that we "look first to the plain language of a statute and interpret it by its ordinary, common meaning." *Luyando v. Grinker*, 8 F.3d 948, 950 (2d Cir.1993). "If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words." *Greenery Rehabilitation Group, Inc. v. Hammon*, 150 F.3d 226, 231 (2d Cir.1998). "Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir.1999). Indeed, "[w]here the language is ambiguous, we focus upon the broader context and primary purpose of the statute." *Castellano v. City of New York*, 142 F.3d 58, 67 (2d Cir.1998) (internal quotation marks omitted). At all times, we are cognizant of the Supreme Court's admonition that "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *see also Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613, 624 (2d Cir.1997) (declining to interpret statute allowing thirty days to petition to terminate or set aside a published plan to convert a federal savings association from mutual to stock form as prohibiting a later-filed securities fraud action because such an interpretation "departs dramatically from the '1–and–3–year' statutes of limitations normal-

ly applicable to private securities actions," because there was an "absence of evidence in the legislative history suggesting such purpose," and "[b]ecause, whenever possible, statutes should be interpreted to avoid unreasonable results").

### B.

■ Parsing the plain language of Section 489 offers little helpful guidance as to the intended scope of the provision. The statutory language simply provides that certain types of people or entities are prohibited from soliciting, buying or taking by assignment, particular types of debt instruments "with the intent and for the purpose of bringing an action or proceeding thereon." On its face, this statutory command might appear to be remarkably broad in scope, forbidding essentially all "secondary" transactions in debt instruments where the purchaser had an intent to enforce the debt obligation through litigation. However, ambiguity resides in the term "with the intent and for the purpose of bringing an action or proceeding thereon." The nature of the proscribed intent and purpose is unclear. After reviewing the pertinent New York state decisions interpreting Section 489, we are convinced that, if the New York Court of Appeals, not us, were hearing this appeal, it would rule that the acquisition of a debt with intent to bring suit against the debtor is not a violation of the statute where, as here, the primary purpose of the suit is the collection of the debt acquired. Consequently we must reverse the judgment of the district court.

### C.

The predecessor statute to Section 489 of the New York Judiciary Law was enacted at least as early as 1813. However, its origins are even more archaic. New York courts have recognized that " § 489[is] the statutory codification of the ancient doctrine of champerty." *Ehrlich v. Rebco Ins. Exch., Ltd.,* 649 N.Y.S.2d 672, 674, 225 A.D.2d 75, 77 (1st Dep't 1996); *see also*

*Fairchild Hiller Corp. v. McDonnell Douglas Corp.,* 28 N.Y.2d 325, 329, 270 N.E.2d 691, 693, 321 N.Y.S.2d 857, 860 (1971) (describing Section 489 and its predecessors as "declaring the practice of champerty and maintenance to be illegal"). Commentators have traced the doctrine of champerty, and its doctrinal near-cousins of maintenance and barratry, back to Greek and Roman law, through the English law of the Middle Ages, and into the statutory or common law of many of the states. *See generally,* Susan Lorde Martin, *Syndicated Lawsuits: Illegal Champerty or New Business Opportunity?,* 30 Am. Bus. L.J. 485, 486–89 (1992); Max Radin, *Maintenance by Champerty,* 24 Cal. L.Rev. 48, 48–66 (1936). As explained by the Supreme Court, "[p]ut simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty." *In re Primus,* 436 U.S. 412, 424 n. 15, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978).

While New York courts have not been unwilling to characterize Section 489 as a champerty statute, it is apparent that they have consistently interpreted the statute as proscribing something narrower than merely "maintaining a suit in return for a financial interest in the outcome." Indeed, far from prohibiting the taking of a financial interest in the outcome of a lawsuit, payment of attorneys by fees contingent upon the outcome of litigation is expressly permissible in New York by statute and court rule. *See* N.Y. Jud. Law § 474–a (McKinney 1986) (setting forth maximum permissible contingent fees in medical, dental, or podiatric malpractice claims); N.Y. Comp.Codes R. & Regs. tit. 22. § 603.7 (1999) (setting forth maximum permissible contingent fees in personal injury, wrongful death, and certain other claims).

A strong indication of the limited scope of the statute is provided by several early New York cases discussing Section 489's predecessor statutes. In *Baldwin v. Lat-*

*son,* 2 Barb. Ch. 306, 1847 WL 4161 (N.Y.Ch.1847), the Court of Chancery rejected the argument that the statute was violated when an attorney purchased a bond and mortgage and brought a foreclosure suit thereupon. The court reasoned that the statute was intended to curtail the practice of attorneys filing suit merely to obtain costs, which at that time included attorney fees. As the court explained, "[t]he object of the statute was to prevent attorneys and solicitors from purchasing debts, or other things in action, for the purpose of obtaining costs from a prosecution thereof, and was never intended to prevent the purchase for the honest purpose of protecting some other important right of the assignee." *Id.* at 308.

The statute was also at issue in *Mann v. Fairchild,* 14 Barbour 548, 1853 WL 5704 (N.Y.Sup.Gen.Term 1853). In what would appear to be a reference to the scourge of attorneys using such debt instruments to obtain costs, as described in *Baldwin,* the *Mann* court stated that "[t]he main object of the statute in question was to prevent litigation by prohibiting the purchase of choses in action by those whose pecuniary interests might be peculiarly advanced by instituting suits upon them, and who, in consequence of their position, might conduct such suits upon unequal terms." *Id.* at 554.

An even clearer indiction of the limited purpose of the statute is provided by the opinions of the two justices writing in *Goodell v. The People,* 5 Parker Crim. R. 206, 1862 WL 4220 (N.Y.Sup.Gen.Term 1862), a case concerning whether the statute covered the situation where an attorney purchased a promissory note with the intent or purpose to bring suit in the justices' court, in which tribunal costs were not granted to the prevailing party. In discussing the purpose of the statute, Justice Campbell wrote:

> That the law of 1818, and previous laws on the subject, were intended to reach a class of men who make a practice, either directly or indirectly, of buying small notes of fifty dollars and upwards, and then prosecuting them in courts of record, in the old common pleas, or in the Supreme Court, and make the defendants pay large bills of costs, even when the suit was undefended, there can be, I think, no doubt. Hence, it was entitled an act to prevent abuses, and to regulate *costs.* The law was aimed at attorneys in courts of record, who were the parties receiving the costs, and who thus oppressed debtors by unexpected and unnecessary prosecutions.

*Id.* at 207 (emphasis in original). Justice Parker, writing separately, agreed that the statute was intended to prevent attorneys from buying debts as an expedient vehicle for obtaining costs. As he explained:

> The purchasing of debts by attorneys, with the intent to bring suits upon them in justices' courts, does not seem to me to be within the mischief which the statute was intended to guard against. No costs being allowed to an attorney in a justice's court, he has no object in buying debts to sue in that court, and I can see neither opportunity nor temptation for him to advance his pecuniary interests by so doing. As he has no temptation to litigate, as a party, in justices' courts, no litigation is induced by his freedom from restraint in that direction....

*Id.* at 211.

The seminal New York Court of Appeals case of *Moses v. McDivitt,* 88 N.Y. 62, 1882 WL 12577 (1882), confirmed that the mischief Section 489 was intended to remedy did not include the acquisition of debt with the motive of collecting it, notwithstanding that litigation might be a necessary step in the process. "Although decided [over] 100 years ago, [*Moses* ] still remains good law." *1015 Gerard Realty Corp. v. A & S Improvements Corp.,* 457 N.Y.S.2d 821, 822, 91 A.D.2d 927, 928, (1st Dep't 1983); *see also Fairchild Hiller,* 28 N.Y.2d at 330, 270 N.E.2d at 693, 321 N.Y.S.2d at 860 (citing *Moses* with approval). In *Moses,* the plaintiff, an attor-

ney, had purchased an assignment of a bond and mortgage that had been executed by the defendant and brought suit for collection of the debt. As a defense, the defendant alleged that the plaintiff's purchase was in violation of the then-in-force predecessor statute to Section 489 because it was a purchase by an attorney of a chose in action "with the intent and for the purpose of bringing any suit thereon." *Moses*, 88 N.Y. at 62. In particular, the defendant produced evidence that the purpose of the plaintiff's purchase was

> to compel the defendant, as a condition of the extension of the time of payment, to assign to him certain stock in a publishing company in which he was interested, in order that the plaintiff might thereby control an election of directors of the company, which was about to take place, or to elect plaintiff president of the company at such election.

*Id.* at 66–67. The trial judge charged the jury, as paraphrased by the Court of Appeals:

> that if the plaintiff purchased the bond simply for the purpose of obtaining the control of the stock, and not for the purpose of bringing suit upon it, he had not violated the statute; but that, if they found that he had bought it with the intention of bringing suit upon it, then, whatever else there might be about it, or however necessary he might have considered it that he should thus fortify himself, he violated the statute. . . . [Moreover,] if his intention in buying it was to use it to compel the defendant to do a particular thing, as to assign stock for instance, and if he would not comply with his wishes to sue [on] it, that would be a violation of the statute.

*Id.* at 67. The Court of Appeals reversed, explaining that:

> a mere intent to bring a suit on a claim purchased does not constitute the offense; *the purchase must be made for the very purpose of bringing such suit, and this implies an exclusion of any other purpose.* As the law now stands,

an attorney is not prohibited from . . . purchasing bonds . . . or other choses in action, either for investment or for profit, or for the protection of other interests, and *such purchase is not made illegal by the existence of the intent on his part at the time of the purchase,* which must always exist in the case of such purchases, to bring suit upon them if necessary for their collection. *To constitute the offense the primary purpose of the purchase must be to enable him to bring a suit, and the intent to bring a suit must not be merely incidental and contingent.* The object of the statute . . . was to prevent attorneys, etc., from purchasing things in action for the purpose of obtaining costs by the prosecution thereof, and it was not intended to prevent a purchase for the purpose of protecting some other right of the assignee.

*Id.* at 65 (emphasis added). Consequently, even though the "primary purpose" of the plaintiff was to induce the defendant to assign his stock, the court concluded that:

> [t]his purpose, whether honest or reprehensible, was not within the prohibition of the statute. The intent to sue upon the bond was secondary and contingent. . . . Under these circumstances it cannot be said that the purpose of the purchase of the bond was to bring a suit upon it. This purpose did not enter into the purchase any more than it would have done had the plaintiff bought the bond as an investment, but with the intention of collecting it by suit if compelled to resort to that means for obtaining payment. *The real question upon which the case turned was, whether the main and primary purpose of the purchase was to bring a suit and make costs, or whether the intention to sue was only secondary and contingent, and the suit was to be resorted to only for the protection of the rights of the plaintiff, in case the primary purpose of the purchase should be frustrated.*

*Id.* at 67–68 (emphasis added).

The continuing vitality of the distinction drawn in *Moses* between cases involving

an impermissible "primary" purpose of bringing suit and those where the intent to sue is merely "secondary and contingent" is confirmed by the post-*Moses* case law. There are only two Court of Appeals cases decided after *Moses* discussing the interpretation of Section 489 or any of its predecessors.[2] In *Sprung v. Jaffe,* 3 N.Y.2d 539, 147 N.E.2d 6, 169 N.Y.S.2d 456 (1957), the Court of Appeals reversed the grant of summary judgment to the plaintiff assignee of a debt instrument on the grounds that the debtor's defense that the assignee had violated a predecessor statute to Section 489 was not a "sham or frivolous" and presented a genuine factual dispute, with respect to the intent and purpose of the assignee, that required resolution by the trier of fact. *Id.* at 543, 147 N.E.2d at 9, 169 N.Y.S.2d at 459. Nevertheless, the *Sprung* court did not say that the plaintiff, an attorney who purchased a $3,000 debt for one dollar and subsequently brought suit, had violated the statute; rather, it found that fact-finding at trial was necessary since, for the purpose of summary judgment, he had failed to provide sufficient proof of a purpose for acquiring the debt other than bringing suit. *Id.* at 545, 147 N.E.2d at 9, 169 N.Y.S.2d at 460. In so ruling, the Court of Appeals cited to *Moses* and reiterated its central holding that "the statute is violated only if the primary purpose of the purchase or taking by assignment of the thing in action is to enable the attorney to commence a suit thereon. The statute does not embrace a case where some other purpose induced the purchase, and the intent to sue was merely incidental and contingent." *Id.,* 3 N.Y.2d at 544, 147 N.E.2d at 8–9, 169 N.Y.S.2d at 460.

The *Moses* approach was again followed in *Fairchild Hiller Corp. v. McDonnell Douglas Corp.,* 28 N.Y.2d 325, 270 N.E.2d 691, 321 N.Y.S.2d 857 (1971), the most recent Court of Appeals case addressing Section 489. In *Fairchild Hiller,* the Court of Appeals affirmed the dismissal of a debtor's affirmative defense that an agreement between two corporations to split the proceeds of any recovery on the disputed claim was in violation of Section 489. The court cited *Moses* and explained that "[w]e have consistently held that in order to fall within the statutory prohibition, the assignment must be made for the very purpose of bringing suit and this implies an exclusion of any other purpose." *Id.,* 28 N.Y.2d at 330, 270 N.E.2d at 693, 321 N.Y.S.2d at 860. Because in *Fairchild Hiller* the claim was assigned as "an incidental part of a substantial commercial transaction," specifically, the acquisition of a corporation's entire assets, the Court of Appeals concluded that the assignment was not prohibited by Section 489. *See id.,* 28 N.Y.2d at 330, 270 N.E.2d at 693, 321 N.Y.S.2d at 860–61. Thus, both *Sprung* and *Fairchild Hiller* demonstrate that the principles set forth in *Moses* continue to be followed by the New York Court of Appeals. That *Moses* remains the law of New York is further evidenced by the decisions of the Appellate Division interpreting Section 489 and its predecessors. In *Ehrlich v. Rebco Insurance Exchange, Ltd.,* 225 A.D.2d 75, 649 N.Y.S.2d 672 (1st Dep't 1996), the Appellate Division, First Department, citing and quoting *Moses* and *Fairchild Hiller,* held that an assignment in which the assignee was bound to bring suit on the claim as part of the consideration for the assignment was in violation of Section 489. *See id.* at 77–78, 649 N.Y.S.2d at 674. Because the contract under which the debt is acquired requires the purchaser or assignee to sue, the purchaser or assignee is being paid to sue and relinquishes any right to consider whether the suit is in his interest. Thus, as the district court correctly stated, in cases involving an obligation to sue, such

---

2. In *Wetmore v. Hegeman,* 88 N.Y. 69 (1882), an appeal decided the same day as *Moses,* the Court of Appeals, citing to *Moses,* reiterated that "[t]he aim of the statute was to prevent attorneys from purchasing claims for the express purpose of instituting suits thereon and thus oppressing debtors and making costs." *Id.* at 73.

as *Ehrlich*, retention of an interest by the assignor is not "necessary to fall within the statutory compass." *Elliott*, 12 F.Supp.2d at 354. Rather, the critical factors that bring such cases within *Moses* are the absence of any purpose for the assignment except bringing legal action and the non-discretionary obligation to bring suit. *See Ehrlich*, 225 A.D.2d at 78, 649 N.Y.S.2d at 674. *See also Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 131 F.R.D. 56 (S.D.N.Y.1990) (holding that Section 489 was violated when a party entered into a patent license agreement in exchange for, *inter alia,* an obligation to sue at least two alleged infringers within a month of the agreement's effective date).

In *Limpar Realty Corp. v. Uswiss Realty Holding, Inc.*, 492 N.Y.S.2d 754, 112 A.D.2d 834 (1st Dep't 1985) (mem.), the Appellate Division, First Department, also examined Section 489. In that case, it rejected the debtor's argument that the assignee's acquisition of a note, mortgage and guarantee followed by the commencement of foreclosure proceedings twenty-seven days later without affording the debtor an opportunity to cure constituted a violation of Section 489. The court reasoned that the debtor could have cured the default at any time during the previous eighteen months, but chose not to do so. *See id.,* 112 A.D.2d at 836, 492 N.Y.S.2d at 755. Noting the prohibition in *Moses* against such acquisitions for the "primary purpose" of bringing suit, the *Limpar* court concluded that that was not the assignee's primary purpose, finding a "legitimate business purpose" evidenced by the acquisition of other real estate on the same city block by the real estate developer on whose behalf the assignee was acting, which negated the inference of acquisition merely to bring suit. *Id.* at 836, 492 N.Y.S.2d at 756. In addition the court reasoned that the commencement of foreclosure proceedings less than a month after the acquisitions was not determinative since the debtor had the opportunity to cure the default before the assignment. *See id.* at 836, 492 N.Y.S.2d at 755. The district court distinguished *Limpar* on the grounds that in *Limpar* "there was no contention that the prior debt–holder had reached an agreement in principle to settle the dispute," whereas in the instant case Peru's Brady Plan was essentially finalized. *Elliott Assocs.*, 12 F.Supp.2d at 355. We do not find the district court's distinction compelling. First, *Limpar* makes no such distinction between on-going and settled or almost settled disputes. Second, Peru's Brady Plan was not binding on all creditors, such as Elliott, that were not members of the Bank Advisory Committee. Thus, given that the Brady system purposefully does not create such a binding obligation, there was no settlement and, consequently, unlike the district court, we do not condemn Elliott merely because "[i]ts purpose was to stand apart from the lenders who had agreed to the Brady restructuring, and to use judicial process to compel full payment." *Id.* at 356.

Other First Department cases are similarly consistent with *Moses* and its progeny. *See, e.g., 1015 Gerard Realty Corp.*, 457 N.Y.S.2d at 822, 91 A.D.2d at 928 (1st Dep't 1983) (mem.) (citing to *Moses* and holding that an attorney's acquisition of a mortgage in default was not in violation of Section 489 because "[a]lthough always present was the intent to bring suit, if necessary, that was not the primary intent."); *Prudential Oil Corp. v. Phillips Petroleum Co.*, 69 A.D.2d 763, 415 N.Y.S.2d 217 (1st Dep't 1979) (affirming dismissal of Section 489 defense on the grounds that the assignment was made as part of a corporate restructuring, as permitted by *Fairchild Hiller,* and not for the purpose of bringing suit). The First Department most recently addressed Section 489 in *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 686 N.Y.S.2d 5 (1st Dep't 1999) (mem.). It affirmed the dismissal of the claim on the acquired debt because the "plaintiff's 'primary purpose' in purchasing [certain debt] certificates was the maintenance of this litigation...."

*Id.* at 6, 259 A.D.2d 273 (citation omitted). This very short memorandum opinion omits any explanation offered by the plaintiff for its purchase of the debt certificates. The court found, however, that the record left "no doubt that the plaintiff's 'primary purpose' in purchasing those certificates was the maintenance of [the] litigation." *Id.* It can be inferred from this finding that, unlike the present case, the debt in *Bluebird* was not acquired for the purpose of collecting it.

The Second Department has similarly been consistent in adhering to the interpretation of Section 489 set forth in *Moses*. *See, e.g., G.G.F. Dev. Corp. v. Andreadis,* 251 A.D.2d 624, 624, 676 N.Y.S.2d 488, 488 (2d Dep't 1998) (mem.) (affirming the grant of summary judgment rejecting the debtor's Section 489 defense in a foreclosure action on the grounds that the mortgage was acquired "as a sound and legitimate business investment" and foreclosure proceedings were not instituted until five months after the assignment); *Grid Realty Corp. v. Gialousakis,* 129 A.D.2d 768, 514 N.Y.S.2d 760 (2d Dep't 1987) (mem.) (affirming the dismissal of a Section 489 affirmative defense on the grounds that the primary purpose of the mortgage assignment was not to bring suit); *Concord Landscapers, Inc. v. Pincus,* 41 A.D.2d 759, 341 N.Y.S.2d 538 (2d Dep't 1973) (citing and applying *Moses* in reversing the trial court's finding of a Section 489 violation). Older Second Department cases likewise relied upon *Moses* to set forth a consistent interpretation of the predecessor statutes to Section 489. *See, e.g., Wightman v. Catlin,* 113 A.D. 24, 29, 98 N.Y.S. 1071, 1073 (2d Dep't 1906) (relying upon *Moses* and explaining that "[t]he evil against which the statute was directed was the purchase of claims for the sole purpose of making costs and annoying persons who would not be sued under other circumstances.... It was only the abuse of purchasing with the intent and for the purpose of bringing the action that the attorney might be benefited by the costs which his own action had produced

which the Legislature prohibited."); *Van Dewater v. Gear,* 21 A.D. 201, 203–04, 47 N.Y.S. 503, 505 (2d Dep't 1897) (citing *Moses* and explaining that, to violate the statute, "[t]here must exist an intent to obtain title for the purpose of commencing an action").

Although offering fewer precedents on the issue than the Appellate Divisions of the other two Departments, the Appellate Divisions of the Third and Fourth Departments have also been consistent in interpreting Section 489 and its predecessors in conformity with *Moses.* Thus, for example in *Beers v. Washbond,* 86 A.D. 582, 584, 83 N.Y.S. 993, 994 (3d Dep't 1903), the Appellate Division, Third Department, explained that "[t]he object of the statutory provision against champerty has been repeatedly stated to be the prevention of oppression by unnecessary litigation which would follow from the right of an attorney to purchase a claim for the sole purpose of enforcing it in the courts and getting costs therefrom." More recently, the Appellate Division, Fourth Department, citing *Moses,* held the assignment of a claim for damage to construction machinery not to violate Section 489 where the assignment was made, not for purposes of bringing suit, but in connection with a subrogation agreement with the claimant's insurer. *See Williams Paving Co., Inc. v. United States Fidelity & Guar. Co.,* 413 N.Y.S.2d 73, 74, 67 A.D.2d 827, 828 (4th Dep't 1979) (mem.). Thus, there would appear to be a general uniformity of precedent among the Appellate Divisions of New York's four judicial Departments with respect to the interpretation of Section 489.

### D.

The cases, spread over more than a century, are not always entirely clear or plainly consistent. Thus the district court found some basis for its construction of the coverage of Section 489 to include Elliott's purchase of the Peruvian debt. We do not agree, however, with this interpretation.

Furthermore, in light of the case law surveyed above, we do not agree with the district court that *Moses* in conjunction with later New York case law "provides little guidance for construing the statute's proper scope." *Elliott Assocs.,* 12 F.Supp.2d at 345. To the contrary, New York courts have stated that *Moses* "undoubtedly correctly states the objects and limitations of the statute." *Wightman v. Catlin,* 113 A.D. 24, 27, 98 N.Y.S. 1071, 1073 (2d Dep't 1906); *see also 1015 Gerard Realty,* 91 A.D.2d at 928, 457 N.Y.S.2d at 822 (describing *Moses* as "[t]he leading case interpreting the champerty statute"). As *Moses* itself makes plain, violation of Section 489 turns on whether "the primary purpose of the purchase [was] . . . to bring a suit," or whether "the intent to bring a suit [was] . . . merely incidental and contingent." *Moses,* 88 N.Y. at 65. The district court reasoned that here "Elliott intended to collect 100% of the debt not by negotiating, participating in a debt-for-equity swap, trading, or going along with the Brady Plan, but rather by suing. Unlike *Moses,* the intent Peru established was the intent to sue, and that intent was not contingent or incidental." *Elliott Assocs.,* 12 F.Supp.2d at 346. We believe the district court misunderstood *Moses.* The *Moses* court made clear that where the debt instrument is acquired for the primary purpose of enforcing it, with intent to resort to litigation to the extent necessary to accomplish the enforcement, the intent to litigate is "merely incidental and contingent" and does not violate the statute. Indeed, the *Moses* court made precisely this point when it explained that "[t]he object of the statute . . . was to prevent attorneys, etc., from purchasing things in action for the purpose of obtaining costs by the prosecution thereof, and it was not intended to prevent a purchase for the purpose of protecting some other right of the assignee." 88 N.Y. at 65. Elsewhere, the Court of Appeals in *Moses* specifically stated that conduct not prohibited by the statute included where "the plaintiff bought the bond as an investment, but

with the intention of collecting it by suit if compelled to resort to that means for obtaining payment." *Id.* at 67. While *Moses* does not set forth a complete taxonomy of conduct prohibited by Section 489 (and neither do we), it plainly sets forth certain conduct that is *not* made unlawful by Section 489.

■ Even accepting as correct the facts as found by the district court, we see no meaningful distinction between Elliott's conduct and the conduct *Moses* expressly states to be outside of the scope of the statute. Here, the district court found that Elliott was the lawful assignee of Nacion's Letter Agreements, that Peru had guaranteed those Letter Agreements, and that both Peru and Nacion are liable to Elliott as a result of Nacion's failure to pay the amounts due and owing under the Letter Agreements. *See Elliott Assocs.,* 12 F.Supp.2d at 344. Far from being a trivial claim that might serve, for example, as the illegitimate vehicle for the recovery of attorney fees, the district court expressly found that "Elliott has suffered damages in excess of $7,000,000 as a result [of the breach]." *Id.*

In purchasing the Peruvian debt the district court found that Elliott's principal aim was to obtain full payment. As it expressly found, "Elliott's primary goal in investing in Peruvian debt was to be paid in full." *Id.* at 339. Moreover, the district court found that if the Debtors did not pay in full, it was Elliott's intent to sue for such payment. Thus, the district court quotes twice the statement of Singer, Elliott's president, that "Peru would either . . . pay us in full or be sued." *Id.* at 335, 339. The district court reasoned that Elliott's "investment strategy . . . to be paid in full or sue . . . equated to an intent to sue because [it] knew Peru would not, under the circumstances, pay in full." *Id.* at 343. We cannot agree with the district court's equating of Elliott's intent to be paid in full, if necessary by suing, with the primary intent to sue prohibited by Sec-

tion 489 as delineated by *Moses* and the related case law.

First, any intent on Elliott's part to bring suit against the Debtors was "incidental and contingent" as those terms are used in *Moses* and the New York case law. It was "incidental" because, as the district court acknowledges, Elliott's "primary goal" in purchasing the debt was to be paid in full. That Elliott had to bring suit to achieve that "primary goal" was therefore "incidental" to its achievement. Elliott's suit was also "contingent" because, had the Debtors agreed to Elliott's request for the money that the district court found Elliott was owed under the Letter Agreements and the Guaranty, then there would have been no lawsuit. Elliott's intent to file suit was therefore contingent on the Debtors' refusal of that demand. Although the district court found that Elliott "knew Peru would not, under the circumstances, pay in full," *id.* at 343, this does not make Elliott's intent to file suit any less contingent. As acknowledged by counsel at oral argument, the Debtors *could* have paid but chose not to pay in order to avoid jeopardizing Peru's Brady Plan.

Second, *Moses* specifically states that conduct not proscribed by the statute includes where "the plaintiff bought the bond as an investment, but with the intention of collecting it by suit if compelled to resort to that means for obtaining payment." *Moses*, 88 N.Y. at 67. Indeed, *Moses* categorically declares that purchase of debt obligations "is not made illegal by the existence of the intent on [the purchaser's] part at the time of the purchase, which must always exist in the case of such purchases, to bring suit upon them if necessary for their collection." *Id.* at 65. As found by the district court, this was Elliott's intent here. Indeed, the district court characterizes Elliott's intent as "to be paid in full or sue." *Elliott Assocs.*, 12 F.Supp.2d at 343. This is precisely the intent that the Court of Appeals in *Moses* determined to be clearly not prohibited by

the statute. Thus, here, Elliott possessed "a legitimate business purpose ... [because Section 489] is 'violated only if the primary purpose of taking the assignment was to commence a suit' and not 'where some other purpose induced the purchase, and the intent to sue was merely incidental and contingent.'" *Limpar*, 112 A.D.2d at 836–37, 492 N.Y.S.2d at 756 (quoting *Goldstein v. Thirlex Realty, Inc.*, 91 Misc.2d 851, 853, 398 N.Y.S.2d 791, 793 (N.Y.Sup. Ct.1977)). Like that of the plaintiff in *Limpar*, Elliott's primary purpose in acquiring the debt was a "legitimate business purpose," *id.* at 836, 492 N.Y.S.2d at 756,— in this case: turning a profit, rather than a collateral purpose prohibited by Section 489, as construed.

As is often the case in complex and well-argued appeals such as this, there are competing policy interests at stake. However, in *Pravin Banker Associates, Ltd. v. Banco Popular Del Peru*, 109 F.3d 850 (2d Cir.1997), another appeal involving an enforcement action on Peruvian sovereign debt, this court set forth and reconciled those differing interests. Although the *Pravin Banker* analysis was made in the context of a comity determination and so examined the interests of the United States rather than New York, those interests are equally applicable to New York's interests as a global financial center in the context of interpreting Section 489. As the court reasoned:

> First, the United States encourages participation in, and advocates the success of, IMF foreign debt resolution procedures under the Brady Plan. Second, the United States has a strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to United States lenders. This second interest limits the first so that, although the United States advocates negotiations to effect debt reduction and continued lending to defaulting foreign sovereigns, it maintains that creditor participation in

such negotiations should be on a strictly voluntary basis. It also requires that debts remain enforceable throughout the negotiations.

*Id.* at 855 (citations omitted). The district court's statutory interpretation here would appear to be inconsistent with this analysis. Rather than furthering the reconciled goal of voluntary creditor participation and the enforcement of valid debts, the district court's interpretation of Section 489 effectively forces creditors such as Elliott to participate in an involuntary "cram-down" procedure and makes the debt instruments unenforceable in the courts once the Bank Advisory Committee has reached an "agreement in principle" in the Brady negotiations. Undermining the voluntary nature of Brady Plan participation and rendering otherwise valid debts unenforceable cannot be considered to be in New York's interest, as made plain by this court in *Pravin Banker*.

Given the mandate that "whenever possible, statutes should be interpreted to avoid unreasonable results," *Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613, 624 (2d Cir.1997), we also take note of the unreasonable results that might ensue were we to accept the district court's interpretation of Section 489. While the district court's rule might benefit the Debtors in the short run, the long term effect would be to cause significant harm to Peru and other developing nations and their institutions seeking to borrow capital in New York. The district court's interpretation would mean that holders of debt instruments would have substantial difficulty selling those instruments if payment were not voluntarily forthcoming. This would therefore add significantly to the risk of making loans to developing nations with poor credit ratings. The additional risk would naturally be reflected in higher borrowing costs to such nations. It could even make loans to some of them unobtainable in New York. A well-developed market of secondary purchasers of defaulted sovereign debt would thereby be disrupted and perhaps destroyed even though its existence provides incentives for primary lenders to continue to lend to high-risk countries.

The interpretation posited by the district court would also create "a perverse result" because it "would permit defendants to create a champerty defense by refusing to honor their loan obligations." *Banque de Gestion Privee–Sib v. La Republica de Paraguay*, 787 F.Supp. 53, 57 (S.D.N.Y.1992). An obligor could simply declare unwillingness to pay, thereby making it plain that no payment would be received without suit. Under such circumstances, prospective purchasers would not be able to acquire the debt instruments without opening themselves up to the defense that their purchase or assignment necessarily was made "with the intent and for the purpose of bringing an action or proceeding thereon," as barred by Section 489. The risk that a debtor might seek to manufacture such a defense by making such a public pronouncement could be expected to add significantly to the cost of borrowing in New York.

Although all debt purchases would be affected by the district court's expansive reading of Section 489, high-risk debt purchases would be particularly affected because of the increased likelihood of nonpayment in such transactions leading to the likely necessity of legal action to obtain payment. As ably pointed out by Elliott and the various *amici curiae*, such increased risks could be expected to increase the costs of trading in high-risk debt under New York law and thereby encourage potential parties to such transactions to conduct their business elsewhere. Moreover, the increased risks are particularly onerous because they premise the validity of the transaction on no more than the buyer's subjective intent, which intent is not always readily ascertainable by the seller, and can only be conclusively resolved by *ex post facto* litigation. While the Debtors argue that the district court's interpretation of *Limpar* creates an "on-going dis-

pute safe harbor" that would limit these effects, as explained above we do not find this interpretation of *Limpar* compelling and, in any event, such a safe harbor would not eliminate the enhanced risks but merely reduce them.

### E.

Elliott has also raised three other grounds for reversing the district court's judgments. First, that, as a limited partnership, it is not an entity covered by Section 489; second, that the district court's fact findings were clearly erroneous; and, third, that Peru's Guaranty was erroneously misinterpreted not to be a permissible waiver of its Section 489 defense. Because we reverse the district court for the reason that it erroneously interpreted Section 489, we need not reach any of these issues. Consequently, we neither express nor imply any view as to any of these issues.

### CONCLUSION

We hold that, in light of the pertinent New York precedent and compelling policy considerations, the district court erroneously interpreted Section 489 of the New York Judiciary Law. In particular, we hold that Section 489 is not violated when, as here, the accused party's "primary goal" is found to be satisfaction of a valid debt and its intent is only to sue absent full performance. Given that, notwithstanding the Section 489 issue, the district court found the Letter Agreements and Guaranty to have been breached by the Debtors, we remand only for the purpose of calculating damages more accurately than the approximate figures given in the district court's opinion and the possible resolution of other attendant damages-related issues.

Accordingly, the judgments of the district court are reversed and the case is remanded.