No. 07-1050-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: September 26, 2008                    Decided: February 13, 2009)

Docket No. 07-1050-cv

TRUST FOR THE CERTIFICATE HOLDERS OF THE MERRILL LYNCH MORTGAGE INVESTORS,
INC. MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 1999-C1, by and through Orix
Capital Markets, LLC, as Master Servicer and Special Servicer,

*Plaintiff-Appellant*,

—v.—

LOVE FUNDING CORPORATION,

*Defendant-Appellee.*[1]

---

[1] By order dated October 31, 2007, the court granted Love Funding Corporation's
motion to withdraw its cross-appeal.  See Order, Trust for the Certificate Holders of the
Merrill Lynch Mortgage Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1
v. Love Funding Corp., No. 07-1285-cv (2d Cir. Oct. 31, 2007).  The Clerk of Court is
therefore directed to amend the caption to conform to our titling of the parties as,
respectively, "plaintiff-appellant" and "defendant-appellee."

1

Before:

RAGGI, *Circuit Judge*, KEENAN, *Senior District Judge*.[2]

_____

Appeal from a judgment of the United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge), entered after a bench trial, voiding as champertous an assignment of rights to plaintiff, a trust representing the holders of commercial mortgage-backed securities, which assignment enabled plaintiff to sue Love Funding Corporation, the originator of a securitized loan held by plaintiff. On this appeal, plaintiff contends that, as a matter of law, the assignment at issue does not constitute champerty under New York Judiciary Law § 489(1). Because we conclude that resolution of this issue depends on significant and unsettled questions of New York law, we certify to the New York Court of Appeals the questions stated at the end of this opinion.

Decision reserved pending the response of the New York Court of Appeals to certified questions of state law.

_____

[2] The Honorable John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

Because the Honorable Guido Calabresi, originally assigned to this panel, recused himself from consideration of this appeal, the decision announced in this opinion has been reached by the panel's remaining two judges pursuant to Local Rule § 0.14(b).

IRA M. FEINBERG (Lorane F. Hebert, Jake M. Shields, *on the brief*), Hogan & Hartson LLP, New York, New York, *for Plaintiff-Appellant*.

ALEC W. FARR (Michael G. Biggers, Anna C. Ursano, *on the brief*), Bryan Cave LLP, Washington, D.C., *for Defendant-Appellee*.

REENA RAGGI, *Circuit Judge*:

This appeal arises out of the sale of commercial mortgage-backed securities, complex financial products held by Wall Street banks in an approximate amount of $100 billion. See Louise Story, Fears Over Commercial Property Loans, N.Y. Times, Aug. 22, 2008, at C1; see also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 199 (2d Cir. 2005) (noting that commercial mortgage-backed securities comprise a "multi-billion dollar market"). Plaintiff, the Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mortgage Pass-Through Certificates, Series 1999-C1, by and through Orix Capital Markets, LLC, as Master Servicer and Special Servicer ("the Trust"), as assignee of certain rights of UBS Real Estate Securities, Inc. ("UBS"), sued Love Funding Corporation ("Love Funding") for breach of certain representations and warranties that Love Funding made in a mortgage-loan-purchase agreement governing the origination of certain commercial mortgage loans held by the Trust. Among other defenses, Love Funding argued that the Trust's suit was barred by New York's statutory prohibition against champerty, see N.Y. Jud. Law § 489(1), because the Trust's primary purpose in obtaining the assignment of

3

UBS's rights was to sue Love Funding. After a bench trial in the United States District Court for the Southern District of New York, Judge Shira A. Scheindlin held the assignment void as champertous and entered judgment in favor of Love Funding. See Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mortgage Pass-Through Certificates Series 1999-C1 v. Love Funding Corp. ("Trust v. Love Funding"), 499 F. Supp. 2d 314, 325 (S.D.N.Y. 2007).

On appeal from that judgment, the Trust argues that the district court misconstrued New York champerty law, which, it asserts, was "never intended to prohibit assignments in complex commercial transactions where the assignee has a substantial interest at stake." Appellant's Br. at 26. We conclude that resolution of this appeal depends on significant and unsettled questions of New York law that are properly answered, in the first instance, by the New York Court of Appeals. Accordingly, we certify the questions stated at the conclusion of this opinion to the Court of Appeals. We retain jurisdiction so that, upon receipt of that court's responses, we may rule on this appeal.

I.    **Background**

   A.    The Mortgage-Loan-Purchase Agreement Between Love Funding and Paine Webber Real Estate Securities, Inc.

Love Funding is a commercial-mortgage-banking company that originates mortgage loans on income-producing real estate. In 1998 and 1999, Love Funding was involved in "conduit lending," a practice in which large investment firms partner with smaller mortgage-

4

banking companies in making loan arrangements. As part of that practice, Love Funding sought loan prospects for an investment bank to fund, typically receiving a fee of 1% of the loan amount for its services.

In April 1999, Love Funding entered into a conduit-lending arrangement with Paine Webber Real Estate Securities, Inc. ("PaineWebber"). That arrangement, which was governed by New York law, was memorialized in an April 23, 1999 mortgage-loan-purchase agreement ("the Love MLPA"). In the Love MLPA, Love Funding represented, inter alia, that none of the underlying mortgage loans were in default.[3]

In the event Love Funding breached that or other representations, the Love MLPA provided PaineWebber with certain remedies, notably:

> Within sixty (60) days of the earlier of either discovery by or notice to the Seller [i.e., Love Funding] of any Breach of a representation or warranty, [Love Funding] shall cure such Breach in all material respects and, if such breach cannot be cured, [Love Funding] shall, at the Purchaser's [i.e., PaineWebber's] option, repurchase such Mortgage Loan at the Repurchase Price.

Love MLPA § 5.03(b). The Love MLPA also afforded PaineWebber the right to

---

[3] Specifically, Love Funding represented that

> [t]here is no default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note and no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration.

Love MLPA § 5.02(cc).

5

indemnification "from and against all demands, claims or asserted claims, liabilities or asserted liabilities, costs and expenses, including reasonable attorneys' fees, incurred . . . in any way arising from or related to any breach of any representation, warranty, covenant or agreement of [Love Funding] hereunder." Id. § 9.14(a).

In November 2000, pursuant to a merger of their parent companies, UBS succeeded in interest to PaineWebber's rights and obligations under the Love MLPA.[4] Thus, in this opinion, references to post-merger events will be to UBS; references to pre-merger events will be to PaineWebber.

### B. The Arlington Loan

In July 1999, pursuant to the Love MLPA, Love Funding arranged a $6.4 million mortgage loan to an entity called the Cyrus II Partnership ("Cyrus"), which was secured by a mortgage on Louisiana property known as the Arlington Apartments.[5] This "Arlington Loan" was further secured by a personal guarantee executed by Mondona Rafizadeh, president of Bahar Development, Inc. ("Bahar"), a corporate entity that served as Cyrus's general partner.

---

[4] UBS also succeeded in interest to PaineWebber's rights and obligations in a separate mortgage-loan-purchase agreement with Merrill Lynch Investors, Inc., discussed infra at [7-9].

[5] Love Funding was the nominal lender; PaineWebber provided the actual financing.

C.	The Mortgage-Loan-Purchase Agreement Between PaineWebber and Merrill Lynch Investors, Inc.

1.	The Securitization Process

As part of a larger commercial-mortgage-backed securities transaction, on November 1, 1999, PaineWebber entered into a separate mortgage-loan-purchase agreement with Merrill Lynch Investors, Inc. ("Merrill Lynch"). Pursuant to that agreement ("the Merrill Lynch MLPA"), PaineWebber sold and assigned 36 loans to Merrill Lynch, three of which — including the Arlington Loan — had been originated by Love Funding.

In a series of related transactions, these 36 loans were then securitized, i.e., pooled and packaged in a manner that allowed for sale to investors. See generally Gariety v. Grant Thornton, LLP, 368 F.3d 356, 359 (4th Cir. 2004) (describing similar securitization process for sub-prime mortgage loans). Central to that securitization process was the execution of a separate agreement, dated November 1, 1999, called a "pooling and servicing agreement." Pursuant to this agreement, the plaintiff Trust was created, with Merrill Lynch acting as depositor; Orix Real Estate Capital Markets, LLC ("Orix"), serving as master and special servicer of the loans[6]; and Norwest Bank Minnesota, National Association, acting as trustee. Additionally, Merrill Lynch assigned to the Trust all of its "right[s], title and interest . . . in,

---

[6] As master and special servicer, Orix was required to perform various administrative functions, including collecting mortgage-loan payments and depositing those payments for the benefit of the certificate holders. Orix was also required to monitor the mortgage loans held by the Trust, a task that enabled it, if appropriate, to foreclose upon property securing these loans.

7

to and under (i) the Mortgage Loans [including the loans sold by PaineWebber], (ii) each Mortgage Loan Purchase Agreement and (iii) all other assets included or to be included" in the Trust. Pooling and Services Agreement § 2.01(a).

The beneficial ownership of the Trust was evidenced by the issuance of the "Mortgage Pass-Through Certificates, Series 1999-C1," which were sold to investors via private placement or public offering. Those certificates, referred to as "commercial mortgage-backed securities" or "CMBS," see LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d at 200, were secured by the underlying commercial mortgages and entitled their holders to interest payments generated by the underlying mortgage loans.

### 2. The Merrill Lynch MLPA Representations

In the Merrill Lynch MLPA, PaineWebber made a representation, akin to that in the Love MLPA, that none of the mortgage loans conveyed were in default.[7] PaineWebber expressly acknowledged that this representation, as with others, was made for the benefit of the Trust's certificate holders and could be enforced by the trustee or its designee. See

---

[7] Specifically, PaineWebber represented that

[t]here is no material default, breach, violation or event of acceleration existing under the related Mortgage or Mortgage Note, and to the Mortgage Loan Seller's [i.e., PaineWebber's] knowledge, there is no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute such a default, breach, violation or event of acceleration.

Merrill Lynch MLPA, Schedule I ¶ (vii).

8

Merrill Lynch MLPA §§ 3.3(d), 5.3. In the event that PaineWebber breached its representations, the Merrill Lynch MLPA afforded the following remedy, among others:

> Within 90 days of the earlier of its discovery or its receipt of notice of any . . . Defective Mortgage Loan . . . , the Mortgage Loan Seller [i.e., PaineWebber] shall cure such Document Defect or Breach in all material respects, which shall include payment of losses and any expenses associated therewith, or, if such Document Defect or Breach cannot be cured within such 90-day period, either (i) repurchase the affected Mortgage Loan at the applicable Repurchase Price not later than the end of such 90-day period, or (ii) substitute a Qualified Substitute Mortgage Loan for such affected Mortgage Loan.

Id. § 3.3(b).

D.    The Arlington Loan Foreclosure Proceedings

In March 2002, although Cyrus was current on principal and interest payments on the Arlington Loan, it failed to pay into escrow the amount required for replacement and repairs on the Arlington Apartments. As a result, on March 8, the Trust declared the Arlington Loan to be in default and accelerated payment on the full amount of the indebtedness. When Cyrus failed to comply, on March 13, the Trust commenced a mortgage-foreclosure action in Louisiana state court.

Pursuant to these foreclosure proceedings, the Arlington Apartments were sold on October 21, 2004, realizing approximately $6.5 million in net proceeds, from which the Trust subsequently received $5.9 million. Thereafter, on December 23, 2004, the Trust obtained a monetary judgment against Cyrus, Bahar, and Rafizadeh in the amount of $10,893,350.96.

9

Among other findings, the Louisiana state court ruled that Cyrus had committed fraud to obtain the Arlington Loan, which fraud constituted an event of default. The Trust represents that, to date, it has recovered less than $5,000 from Cyrus and its principals on the Louisiana judgment.

E.     The Trust's Suit Against UBS

Within months of instituting the Louisiana foreclosure action, the Trust pressed its remedies against UBS. The Trust theorized that, because fraud by Cyrus had put the Arlington Loan in default from the outset, PaineWebber (and, hence, its successor UBS) had necessarily breached its representation in the Merrill Lynch MLPA that the Arlington Loan contained no material default.[8] The Trust demanded that UBS repurchase the Arlington Loan as well as other loans purportedly infected by defaults. UBS refused, triggering what the district court aptly described as approximately two years of "scorched earth litigation" between the Trust and UBS. Trust v. Love Funding, 499 F. Supp. 2d at 318.

On September 13, 2004, the Trust and UBS settled their litigation pursuant to an agreement whereby they exchanged mutual releases as to future claims relating to 33 loans assigned by UBS and deposited in the Trust. As consideration for the releases on 32 of the

---

[8] As the district court noted, it is undisputed that Love Funding was unaware of Cyrus's fraud at the time it assigned the Arlington Loan pursuant to the Love MLPA. Indeed, the parties stipulated that Love Funding only learned of Cyrus's fraud in the fall of 2002, some months after the Trust itself learned this fact. See Trust v. Love Funding, 499 F. Supp. 2d at 317.

10

loans, UBS paid the Trust $19.375 million.  With respect to the Arlington Loan, however, the sole consideration for the Trust's release was UBS's assignment to the Trust of all of UBS's rights embodied in the Love MLPA.  See id. at 319.  That assignment is the subject of the parties' champerty dispute.

F.      The Trust's Suit Against Love Funding

On November 1, 2004, the Trust sued Love Funding in the Supreme Court of the State of New York.  In a letter sent two days later, the Trust "demand[ed] that Love Funding cure [its] breaches or, if (but only if) cure is not possible, repurchase the Arlington Loan at the Repurchase Price as required by Section 5.03 of the MLPA."  Letter from Michael F. Wurst, Director, Distressed & Proprietary Assets, Orix Capital Markets, LLC, to Karen Ford, Senior Vice President, Love Funding Corp. (Nov. 3, 2004), at 2.  Love Funding rejected the demand and subsequently removed the Trust's lawsuit — the subject of this appeal — to federal court.

G.      The District Court Proceedings

1.      October 11, 2005 Decision

On cross-motions for summary judgment, the district court ruled in favor of the Trust on the issue of Love Funding's breach of § 5.02(cc) of the Love MLPA, the provision in which Love Funding had represented that the conveyed mortgage notes contained no default, breach, violation, or event of acceleration.  See Trust for the Certificate Holders of the

11

Merrill Lynch Mortgage Pass-Through Certificates Series 1999-C1 v. Love Funding Corp., No. 04 Civ. 9890, 2005 WL 2582177, at *7 (S.D.N.Y. Oct. 11, 2005). At the same time, however, the district court authorized Love Funding to amend its answer to assert the affirmative defense of champerty. Id. at *4.

### 2. February 27, 2007 Decision

On February 27, 2007, after a bench trial, the district court ruled that, with respect to the Arlington Loan assignment, Love Funding had proved its champerty defense by a preponderance of the evidence. See Trust v. Love Funding, 499 F. Supp. 2d at 324-25. The district court observed that to demonstrate that the transaction was champertous under New York Judiciary Law § 489(1), Love Funding had to show that the Trust's "'primary purpose [for], if not the sole motivation behind, entering into the transaction'" at issue was to sue on the assigned claim. Id. at 315 (quoting Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d 726, 736, 709 N.Y.S.2d 865, 871 (2000)). Although the Trust argued that its November 3, 2004 letter to Love Funding demonstrated that its purpose was, in fact, "to resolve its claims without litigation," the district court rejected this argument as "disingenuous" given that the Trust had already initiated a lawsuit two days earlier. Id. at 321-22.

In any event, the district court found that the circumstances leading up to the Arlington Loan assignment and the terms of the assignment convincingly demonstrated that "the Trust's primary purpose in accepting the Assignment was to buy a lawsuit against Love

12

Funding." Id. at 322. Notably, the court stated that,

> [d]uring settlement negotiations, UBS and the Trust discussed various ways of settling the Arlington Loan dispute. One option was that UBS would repay the Trust for its overpayment to UBS for this now-defaulted loan. At one point, the Trust had requested that UBS pay it an additional "$4 or $5 million" as compensation for Arlington.
>
> An alternative option, the one ultimately chosen, was the Assignment. Initially, however, the Trust was reluctant to accept the Assignment. [Orix representative John] Dinan testified that:
>
> > I recall there being a discussion about, you know . . . if we [i.e., the Trust] take the assignment, then we're basically — which we did not want to do, you know, then we're just — we're continuing a microcosm of the litigation that has already been going on for the last three years with UBS.
>
> James Thompson, President and CEO of Orix USA, characterized the Assignment similarly in an email he sent to Brian Harris of UBS a week before the Settlement was finalized. Thompson wrote: ". . . our [the Trust's] guys . . . do like the Love Funding claim, but that's a whole new lawsuit, which doesn't turn a lot of folks on."

Id. at 319-20 (emphases and final alteration in original) (footnotes omitted).

> From these facts, the district court determined that
>
> UBS and the Trust treated the Arlington Loan separately from all of the other [Merrill Lynch] Litigation loans. Not a cent of UBS's $19.375 million Settlement payment to the Trust was allocated to the Arlington Loan. The Trust took, as its sole consideration from UBS for losses related to Arlington, all of UBS's rights and claims against Love Funding under the Love MLPA.

Id. at 320. The district court concluded that this "carve out of a single loan from a group of loans that were settled for significant payments" distinguished the case from others relied on by the Trust in which claim assignments were not deemed champertous. Id. at 324 & n.76

13

(collecting cases).

> The district court deemed it "[c]ritical" to its identification of champerty that
>
> after two years of angry and expensive litigation, the only compensation the Trust took in exchange for releasing UBS from the Arlington Loan — a "poster child" of the [Merrill Lynch] Litigation — was the Assignment. The record is devoid of evidence suggesting why the Trust would consider the Assignment adequate consideration if its primary purpose was <u>not</u> to sue Love Funding thereunder. Quite literally, the Trust had negotiated for itself "a whole new lawsuit," with the intent to "basically . . . continu[e] a microcosm of the litigation that ha[d] already been going on for the last three years with UBS."

<u>Id.</u> at 322-23 (emphasis and last two alterations in original) (footnotes omitted). The district court also found that the champertous nature of the assignment was evidenced by the Trust's perception that it could recover "millions of dollars more" on the Arlington Loan by suing Love Funding than by pursuing a cash settlement from UBS:

> Under the Love MLPA, the Trust could sue (and is suing) Love Funding for the principal balance of the loan, as well as for millions of dollars in simple and default interest that have been accruing on the loan for years. Because simple interest began accruing shortly after the Trust notified Cyrus that the loan was in default, in January 2002, it now totals over $2.5 million. And given a Louisiana court's finding that default interest began accruing on the loan as of July 7, 1999, the Trust is now claiming additional damages of approximately $2.4 million.

<u>Id.</u> at 322-23 (footnotes omitted). Finally, the district court found that, by accepting the assignment, the Trust

> believed it could also potentially recover indemnification damages from Love Funding under section 9.14 of the Love MLPA. The Trust's particular attraction to this provision is clear from the fact that section 9.14 is the <u>only</u> provision of the Love MLPA specifically identified in the language of the

14

Assignment. Under section 9.14, Love Funding could be required to indemnify the Trust not only for attorneys' fees and costs expended pursuing Love Funding, but also for all attorneys' fees and costs expended foreclosing on the property and pursuing Cyrus and Rafizadeh. Moreover, the Trust urges this Court to find that section 9.14 also obligates Love Funding to indemnify the Trust for a portion of the legal fees UBS incurred during the [Merrill Lynch] Litigation [i.e., the fees UBS incurred in its litigation with the Trust].

Id. at 323 (emphasis in original) (footnotes omitted).[9] Thus, the district court concluded,

"the Trust had a strong incentive to sue Love Funding from the time it accepted the

Assignment." Id.[10]

This appeal followed.

## II. Discussion

### A. Certification Standards

Under our local rules, when authorized by state law, "'this Court may certify to the

---

[9] In its brief to this court, the Trust asserts that it "does seek indemnification from Love Funding under the indemnification provision of the Love Funding MLPA, and seeks to recover the attorneys' fees and costs to which it is entitled under that contract." Appellant's Br. at 45. Similarly, the Trust confirmed at oral argument that it construed the assignment to allow it to pursue fully UBS's rights of indemnification against Love Funding.

[10] In a final footnote to its February 27, 2007 opinion, the district court stated that, if the Arlington Loan assignment were not voided by champerty, it would award the Trust $1,736,668.35 in damages, consisting of the loan repurchase price as of September 30, 2002, offset by the Trust's modest recovery to date from Cyrus, Bahar, and Rafizadeh, and the proceeds from the sale of the Arlington Apartments. See id. at 325 n.79. This hypothetical award, which limited the Trust's claims for default-interest payments and declined to award disputed indemnification damages, was considerably less than the roughly $10,000,000 that the district court found the Trust unrealistically to have demanded from Love Funding to avoid litigation. See id. at 320-21.

highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court.'" Israel v. Chabra, 537 F.3d 86, 100 (2d Cir. 2008) (quoting Second Cir. R. § 0.27). Section 500.27 of the New York Rules of Court authorizes certification "[w]henever it appears to . . . any United States Court of Appeals . . . that determinative questions of New York law are involved in a case pending before that court for which no controlling precedent of the [New York] Court of Appeals exists." N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a). Although we have described certification as an "exceptional procedure," it is appropriately invoked where a "statute's plain language does not indicate the answer to the question pending before the court, and there is an absence of authoritative state court interpretations of the state statute." McGrath v. Toys "R" Us, Inc., 356 F.3d 246, 250 (2d Cir. 2004) (internal citation and quotation marks omitted). Such is our case.

B.     The Unsettled Questions of New York Law

New York's prohibition against champerty is codified in New York Judiciary Law § 489(1). That provision states, in relevant part:

> [N]o corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon.

16

Id.[11]

While New York courts have had several occasions to construe this statutory text, those interpretations have, as we noted in Elliott Associates, L.P. v. Banco de la Nacion, 194 F.3d 363, 377 (2d Cir. 1999), not always been clear or consistent. In Elliott Associates, however, there was consistency on what mattered: New York cases had consistently refused to characterize as champertous a transacting party's acquisition of a debt instrument for the primary purpose of enforcing it. See id. at 378. Thus, because the district court in Elliott Associates had determined that the plaintiff's "'primary goal in purchasing the debt was to be paid in full,'" id., we were able to apply the established state principle on appeal without any need for certification, see id. at 370.

In this case, the district court did not find that the Trust's primary intent when purchasing the debt instruments was to be paid in full. Rather, it found that the Trust's "primary purpose" in accepting the challenged assignment was "to buy a lawsuit against Love Funding." Trust v. Love Funding, 499 F. Supp. 2d at 322; see also id. at 324 n.75 (distinguishing Elliott Associates). The Trust challenges this assessment of its intent, in essence asserting that the facts cited by the district court to support its conclusion are

---

[11] The statute was amended in 2004 to add sections (2) and (3), which reference a safe harbor for certain transactions. See 2004 N.Y. Sess. Laws Ch. 394 (McKinney). Because the Trust did not seek the shelter of the safe harbor, we have no cause to consider these sections. We note the statute's amendment simply to explain that our reference to the historic champerty provision now codified at § 489(1) is intended to correlate with pre-amendment references to § 489.

insufficient as a matter of New York law to prove champerty. This argument forces us to confront several questions of New York law not clearly answered by established precedent. Mindful that these questions arise in the context of "sophisticated business transactions," and of the importance of New York law to the State's preeminent role in world financial affairs, Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d at 739, 709 N.Y.S.2d at 873, we conclude that certification of these questions to the New York Court of Appeals is warranted.

### 1. The Level of Intent Necessary to Demonstrate Champerty

The first issue raised by this appeal is whether the district court's finding that the Trust's "primary" intent was "to buy a lawsuit against Love Funding," Trust v. Love Funding, 499 F. Supp. 2d at 322, is legally sufficient to demonstrate champerty under New York Judiciary Law § 489(1). Before addressing whether an intent "to buy a lawsuit" is, on the facts of this case, legally sufficient to demonstrate champerty, we note some ambiguity in New York jurisprudence as to whether the level of champertous intent proscribed by § 489(1) can be "primary" or whether it must, in fact, be "sole."

The ambiguity originates with the seminal New York champerty case, Moses v. McDivitt, 88 N.Y. 62 (1882), which seems to allude to both primary and sole intent. At one point, Moses explains that, to violate § 489, "the primary purpose of the purchase must be to enable [a transacting party] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent." Id. at 65 (emphasis added). At the same time, however, Moses

18

states that "a mere intent to bring a suit on a claim purchased does not constitute the offense; the purchase must be made for the very purpose of bringing such suit, and this implies an exclusion of any other purpose." Id. (emphases added). The highlighted language suggests that the proscribed intent must be singular.

Subsequent cases did little to clarify the statute's intent requirement. Compare Sprung v. Jaffe, 3 N.Y.2d 539, 544, 169 N.Y.S.2d 456, 460 (1957) (holding that statute is violated "only if the primary purpose of the purchase or taking by assignment of the thing in action is to enable the attorney to commence a suit thereon" (emphasis added)), with Fairchild Hiller Corp. v. McDonnell Douglas Corp., 28 N.Y.2d 325, 330, 321 N.Y.S.2d 857, 860 (1971) (referencing "exclusion of any other purpose" and "primary purpose" phrases used in Moses and Sprung v. Jaffe in holding that challenged assignment was not champertous because assignee did not receive it "for the sole and primary purpose of bringing an action" (emphasis added)).

In Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d at 735-36, 709 N.Y.S.2d at 871, the New York Court of Appeals recognized the interpretive tension in these precedents. Moreover, it acknowledged that "a purpose that is primary is not necessarily the sole purpose." Id. at 736, 709 N.Y.S.2d at 871. In Bluebird Partners, however, the Court of Appeals did not have to choose between these two degrees of intent because the record in the case did not permit a finding of a primary champertous motivation, a conclusion that necessarily foreclosed any finding as to a sole champertous intent. See id. This factual

19

context is critical to understanding the Court of Appeals' ruling that "the foundational intent to sue on that claim must <u>at least have been</u> the primary purpose for, if not the sole motivation behind, entering into the transaction." <u>Id.</u> (emphasis added). The term "at least" generally indicates that a certain showing is "necessary" but not always "sufficient" to establish a particular fact. <u>K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.</u>, 61 F.3d 123, 129 (2d Cir. 1995) (interpreting term in other context). Thus, by using "at least" to discuss a primary champertous intent in <u>Bluebird Partners</u>, the Court of Appeals appears to have reserved for another day the question of whether the proof of intent ultimately required is "primary" or "sole."[12]

Thus, we now ask the Court of Appeals to clarify whether a finding of a "primary" champertous intent is legally sufficient to void an assignment under § 489(1), or whether a further finding is required that the proscribed intent was "sole."

## 2. The Scope of the § 489(1) Proscription

As always in certifying questions to the New York Court of Appeals, we do not bind the court to the particular questions stated. In this case, the Court of Appeals may well

---

[12] Embedded in <u>Bluebird Partners</u>' discussion of champertous intent is the statement that the primary/sole distinction "is one without a legal difference when the 'primary' element is present." 94 N.Y.2d at 736, 709 N.Y.S.2d at 871. Standing alone, this statement might be construed to signal that a finding of primary intent is, by itself, sufficient to void a transaction as champertous. In the factual context of the case, however, the Court of Appeals may have meant to communicate that the primary/sole distinction is without legal significance when, as in <u>Bluebird Partners</u>, primary intent is <u>not</u> present. In responding to the certified questions, the Court of Appeals may wish to clarify this point.

20

conclude that the critical issue to assessing the sufficiency of the champerty finding is not the denomination of the Trust's intent as "primary" or "sole," but the purpose behind its acquisition of rights that allowed it to sue Love Funding.

As this court recognized in Elliot Associates, L.P. v. Banco de la Nacion, the language of § 489 appears to "forbid[] essentially all 'secondary' transactions in debt instruments where the purchaser had an intent to enforce the debt obligation through litigation." 194 F.3d at 372. New York, however, has plainly declined to construe the statute so broadly. Mindful of the traditionally narrow scope of champerty, which focused primarily on preventing persons "from filing suit merely as a vehicle for obtaining costs [and] attorneys' fees," Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d at 734, 709 N.Y.S.2d at 870 (reviewing history of champerty), the Court of Appeals has expressly held that an intent to sue "cannot automatically become synonymous with champerty, for litigation can be an appropriate and commonly used strategy," id. at 738, 709 N.Y.S.2d at 872; see also Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d at 372-73 (discussing statute's focus on preventing acquisition of debts "as an expedient vehicle for obtaining costs" and holding that "acquisition of a debt with intent to bring suit against the debtor is not a violation of the statute where, as here, the primary purpose of the suit is the collection of the debt acquired").

Thus, a question arises as to whether the intent to "buy a lawsuit" identified by the district court, Trust v. Love Funding, 499 F. Supp. 2d at 322, necessarily equates with the intent proscribed by New York Judiciary Law § 489(1). Specifically, would it make a

21

difference whether the new lawsuit was purchased (a) to allow the purchaser to profit from the costs and fees that could be generated by that lawsuit, or, instead, (b) to provide a means to enforce an otherwise legitimate obligation?

The Trust was not, after all, a party with no interest in the loans that Love Funding had transferred to PaineWebber pursuant to the Love MLPA. To the contrary, as the end holder of the Arlington Loan, the Trust was the party that would directly suffer the damages of any default on that instrument. To be sure, the default that the Trust declared against Cyrus for failure to post required collateral was distinct from the default the district court found as a result of Cyrus's initial fraud in acquiring the loan. Notably, the former default would not, by itself, have supported a claim that Love Funding had materially breached its representation to PaineWebber (and, hence, to its successor UBS). The Trust could not, however, sue Love Funding directly for damages linked to Cyrus's initial fraud for the simple reason that no privity existed between the Trust and Love Funding. Thus, the Trust first sued UBS and, then, by accepting in settlement an assignment of UBS's rights in the Love MLPA, the Trust effectively acquired privity with Love Funding. It is in this sense that the Trust might be viewed, as the district court found, to have bought a "'whole new lawsuit,'" Trust v. Love Funding, 499 F. Supp. 2d at 322, i.e., a lawsuit that it could not have filed on its own — but hardly one involving a debt obligation that it had no interest in collecting.

It is not clear whether New York law would view an intent to acquire a lawsuit in such circumstances as champertous. In Bellarno International Ltd. v. Irving Trust Co., the First

22

Department held that an assignment was not champertous where the "plaintiff was not a stranger to the transaction, and the assignment was made for the purpose of facilitating a recovery as compensation for an alleged wrong, in an action already commenced and pending." 165 A.D.2d 809, 809, 560 N.Y.S.2d 287, 288 (1st Dep't 1990) (internal citations omitted); see also Williams Paving Co. v. U.S. Fid. & Guar. Co., 67 A.D.2d 827, 828, 413 N.Y.S.2d 73, 74 (4th Dep't 1979) (holding assignment not champertous where assignee's "primary purpose was to protect its own interest in attempting to collect its judgment"). To be sure, at the time the Trust acquired the assignment, the Trust's original action against UBS on the Arlington Loan was no longer "pending." Moreover, as the district court observed, neither the Trust nor UBS had ever sought to implead Love Funding throughout the course of their protracted litigation. See Trust v. Love Funding, 499 F. Supp. 2d at 325. These circumstances, however, do not indicate that the Trust acquired UBS's interests simply to pursue the classic rewards of champerty, i.e., the costs and fees it could generate from new litigation.

Indeed, we are aware of no New York case addressing facts akin to those presented on this appeal, i.e., where a party that holds a proprietary interest in a debt instrument accepts an assignment of rights that allows it to sue a party that had purportedly misrepresented to the assignor that the instrument was not in default. Thus, we ask the New York Court of Appeals to indicate whether the intent to acquire such rights, even if properly characterized as the

23

intent to "to buy a lawsuit," id. at 322, is legally sufficient to constitute champerty.[13]

### 3. Whether an Intent to Realize More From a Lawsuit to Enforce Assigned Rights Than One Might Have Recovered in Settlement from the Assigning Party Makes the Assignment Champertous

In voiding the challenged assignment as champertous, the district court found that the Trust's intent in suing Love Funding was to recover more in compensation for its losses on the Arlington Loan than it had demanded in settlement from UBS on this debt obligation. See Trust v. Love Funding, 499 F. Supp. 2d at 323 ("From the Trust's perspective, a lawsuit against Love Funding could potentially reap millions of dollars more than the Trust had been prepared to accept from UBS on the Arlington Loan."). Further, the district court noted that the assignment enabled the Trust to pursue UBS's rights to indemnification against Love Funding, which, in the Trust's view, allowed it to sue for the extensive attorneys' fees and costs incurred in foreclosing on the Arlington Apartments and in pursuing claims against Cyrus, Rafizadeh, and Love Funding, as well as certain fees and costs that UBS had incurred in defending its litigation with the Trust itself. See id.[14] The Trust further sought to recover

---

[13] We expect that any consideration of this question will be informed by the fact that the challenged Arlington Loan assignment arose in the context of a broad settlement agreement, see Fairchild Hiller Corp. v. McDonnell Douglas Corp., 28 N.Y.2d at 330, 321 N.Y.S.2d at 861 (noting that challenged assignment was "an incidental part of a substantial commercial transaction"), as well as by the district court's finding that this assignment was "carve[d] out" from "a group of loans that were settled for significant payments," Trust v. Love Funding, 499 F. Supp. 2d at 324.

[14] We note that, on appeal, the Trust claims that the indemnification damages it seeks from Love Funding "are almost identical to the damages that the Trust could previously have

from Love Funding the interest that had been accruing on the loan over the years.  See id.  As a result, the district court concluded that the Trust's intent in suing Love Funding was not only to be made whole on losses sustained from the Arlington Loan default, but also to profit from the litigation itself, a motivation apparently consistent with champerty.  See id.; see also Promenade v. Schindler Elevator Corp., 39 A.D.3d 221, 223, 834 N.Y.S.2d 97, 99 (1st Dep't 2007) (suggesting impropriety of obtaining assignment as "investment").

As we have already observed, a party's acquisition of rights in order to profit from the very act of maintaining a lawsuit by generating compensable costs and fees constitutes a classic case of champerty.  See Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d at 734, 709 N.Y.S.2d at 870; Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d at 373.  But we have identified no New York case holding that champerty is evidenced by the settlement of one legitimate dispute (that between the Trust and UBS) through an assignment of indemnification rights for reasonable costs and fees incurred in legal actions that have already transpired.  To the extent such rights might be viewed as akin to any other debt obligation held by the assigning party, a question arises as to whether their acquisition could legally support a claim of champerty, particularly if the acquiring party's intent is simply to obtain payment of that debt "even should litigation become necessary."  Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d at 737, 709 N.Y.S.2d at 871.  Thus, we ask the New York

sought from UBS."  Appellant's Br. at 45.  The district court, however, did not make such a finding; thus, on this appeal, we treat that assertion as unresolved.

25

Court of Appeals to indicate whether such an assignment of costs and fees in the circumstances of this case constitutes champerty.

Similarly, we have identified no New York case indicating whether, when a party (here, the Trust) settles a dispute by accepting a transfer of rights (UBS's rights under the Love MLPA) that hold the potential for a greater recovery than the parties had explored as a cash settlement, the acquisition of such rights can be deemed champertous if the acquiring party is, in fact, using litigation to seek full payment of the purported debt obligation rather than "merely as a vehicle for obtaining costs [and] attorneys' fees." Id. at 734, 709 N.Y.S.2d at 870. Accordingly, mindful of the New York Court of Appeals' concern that the "champerty cloud" not cast a shadow "too easily over modern business practices and dispute resolutions involving the acquisition of securities and their concomitant rights," id. at 737, 709 N.Y.S.2d at 871, we ask that court to clarify the application of the champerty doctrine to these facts.

## III. Conclusion

For the reasons stated, the court hereby certifies the following questions to the New York Court of Appeals:

1. Is it sufficient as a matter of law to find that a party accepted a challenged assignment with the "primary" intent proscribed by New York Judiciary Law § 489(1), or must there be a finding of "sole" intent?

2. As a matter of law, does a party commit champerty when it "buys a lawsuit" that it could not otherwise have pursued if its purpose is thereby to collect

26

damages for losses on a debt instrument in which it holds a pre-existing proprietary interest?

3.    (a) As a matter of law, does a party commit champerty when, as the holder of a defaulted debt obligation, it acquires the right to pursue a lawsuit against a third party in order to collect more damages through that litigation than it had demanded in settlement from the assignor?

(b) Is the answer to question 3(a) affected by the fact that the challenged assignment enabled the assignee to exercise the assignor's indemnification rights for reasonable costs and attorneys' fees?

The Court of Appeals may answer these questions in whatever order it deems best to assist this court in determining whether the facts of this case demonstrate champerty. Similarly, the Court of Appeals may expand these certified questions to address any other issues of New York law pertinent to this appeal.

This panel retains jurisdiction for purposes of resolving this appeal once the New York Court of Appeals has responded to our certification.

It is, therefore, ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals a certificate, as set forth below, together with this opinion and a complete set of briefs, appendices, and the record filed in this case by the parties.

## IV.   <u>Certificate</u>

The foregoing is hereby certified to the Court of Appeals of the State of New York

27

pursuant to Second Cir. R. § 0.27 and N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27, as ordered by the United States Court of Appeals for the Second Circuit.